In re SNIDER BROS., INC., Acme Boneless Beef Co., Inc., Sutton Leasing Co., Inc., Portion Control Meat Processing Co., Inc., Quik "N" Ezy Meat Products, Inc., and Snider Food & Storage, Inc., Debtors.

Bankruptcy Nos. 4–80–00587–G to 4–80–00592–G.

United States Bankruptcy Court, D. Massachusetts.

March 8, 1982.

Mark N. Berman, Widett, Slater & Goldman, P.C., Boston, Mass., for creditors committees.

Sumner Silver, Talamo, Phillips, Silver & Talman, P.C., Worcester, Mass., for Commerce Bank & Trust Co.

James F. Queenan, Jr., Bowditch & Dewey, Worcester, Mass., for Snider Bros., Inc., et al.

## MEMORANDUM AND ORDER ON APPLICATION FOR SUBSTANTIVE CONSOLIDATION

PAUL W. GLENNON, Bankruptcy Judge.

The six above-captioned corporate debtors filed individual voluntary petitions for

Reorganization under Chapter 11 of the Bankruptcy Code. The cases have been jointly administered from their inception, but the creditors committees for all six corporate debtors now seek the consolidation of all of the assets and liabilities of the six debtors, as well as the elimination of all intercorporate debts, which they argue will benefit creditors generally. The Commerce Bank & Trust Co., a large secured creditor, interposed its objection to consolidation on the grounds that its secured position would be impaired thereby. The matter was argued orally on May 18, 1981, without testimony from any witnesses, and the matter taken under advisement pending receipt by the court of memoranda and affidavits. In the interim, all six debtors' Chapter 11 cases have been converted to Chapter 7.[1]

On September 9, 1980, Snider Bros., Inc., Acme Boneless Beef Co., Inc., Sutton Leasing Co., Inc., Portion Control Meat Processing Co., Inc., Quik "N" Ezy Meat Products, Inc. and Snider Food & Storage, Inc. each filed a voluntary petition for reorganization. All six debtors operated at a single location in Sutton, Massachusetts. Additionally, each corporation performed a separate function in a larger wholesale and retail meat operation. Snider Bros. had been in the business of purchasing, slaughtering, and processing beef cattle since 1931. Acme Boneless Beef was created in 1954 to market beef products at wholesale. Portion Control came into existence in 1955 for the purpose of selling general meat products. That same year, Quik "N" Ezy was formed to begin the business of selling meat products at retail. Sutton Leasing and Snider Food & Storage were both formed later to own, and lease back, the real property and buildings from which the other four companies did business.

Benjamin, Abraham and Jack Snider are the principal stockholders of all six corporations. Additionally, they are the officers and directors of each company. As a result, it is more than apparent that the six debtor corporations, although individually incorporated, can be fairly described as a family-run "integrated business operation for the purchasing, slaughtering, processing, packaging and sale, both at wholesale and retail, of meat and meat products".[2] Every step in the process of bringing meat products from the farm to the consumer is covered by one of the six corporations.

The business of the debtors was successful until cash flow problems arose in connection with their various operations. When the Chapter 11 petitions were filed, the debtors were in need of immediate financing in order to continue their day-to-day operations. The Commerce Bank financed the debtors' operations for two months before deciding to terminate its loan agreement. In November 1980, after the Bank stopped advances to the debtors, all business operations ceased. While it has never been stated, it seems apparent that one of the reasons for seeking consolidation was the hope that it would facilitate a sale of all of the debtors' assets as a going concern, or the investment of new money by an outside source. Apparently the prayers of creditors were never answered, resulting in conversion of all six estates to liquidation under Chapter 7.

The creditors committees for all six debtors have sought consolidation on the grounds that, because of the inter-corporate relationship of the debtors, the accounting difficulties and expense involved in trying to separate their financial affairs, and the fact that creditors were generally aware of the interrelationship of these six debtors, it would be equitable to consolidate and

---

1. The Bankruptcy Code has no provision for creditors committees in a Chapter 7 case. Therefore, it could be said that the committees are no longer properly before the court. However, because the debtors themselves assented to consolidation, and because the question could be easily raised again, I have chosen to deal with the question anyway, so as to avoid the need for future hearings on any similar request by the debtors or the trustee. Finally, unless either the debtors or the trustee were to bring new evidence to the court, this decision would be equally applicable to any request they might make for consolidation.

2. Memorandum of Applicants, at p. 3.

merge the separate estates into one. The Commerce Bank, though it did not object in writing, did appear and object verbally to consolidation on May 18, 1981. As grounds therefore, Commerce Bank alleged a valid security interest in certain accounts receivable of these debtors which, if the cases are consolidated, could be reduced by offsetting claims. It is argued that a creditor of one debtor could offset his claim against any debt which he might owe to another debtor. The bank claims that receivables would, in this way, be diminished by $70,000. The creditors committees have not refuted that claim, nor do they take issue with it, but instead argue that equity should not permit the bank to "cower behind the fiction of the debtors' corporate facade" when in fact it never relied on the corporate separateness of these debtors.

The facts which bear upon the Court's decision appear to be substantially undisputed. The committees point out that there were periodic inter-corporate transfers of assets between the various debtors which are reflected in the books and records of each debtor. It is conceded that each debtor did keep separate books of account, prepared separate financial statements, and submitted individual corporate tax returns. Michael Gilburd, the court-authorized accountant for the debtors, in his affidavit attached to the Memorandum of the creditors committees, averred that considerable time and expense would be necessary to *verify* the accuracy of the many inter-corporate transfers which are reflected on the books of each debtor, as well as to verify certain unexplained correcting entries which he presumed were made in settling inter-corporate accounts. The bank does not dispute that inter-corporate transfers occurred, but argues that those transfers are all properly recorded on the books of account for the debtors involved.

The creditors committees cite the inter-corporate use of certain personnel without proper allocations of payroll expense as another example of the lack of corporate separateness of these debtors. The affidavit of Morris Abramoff recounted the fact that in his capacity as a purchasing and selling agent on the payroll of Acme Boneless Beef, he also purchased and sold all the beef for Snider Bros. Additionally, the creditors committees allege that although the debtors kept separate books of account, those books were collectively maintained by a single bookkeeping staff. The bank acknowledges the fact that certain individuals did not work exclusively for the company that was paying them, but argues that with respect to the bookkeeping staff, the individuals were all on different corporate payrolls, so that each corporation made contributions to overall bookkeeping expense. Finally, both sides agree that, for the most part, each corporation maintained a separate personnel base and associated payroll, except for the few examples cited.

There were inter-corporate guarantees of loans as well as loans between the various debtors. The schedules of each debtor reveal guarantees by each debtor of bank loans to the other corporations. Further, the Bank concedes that when one of the debtors would be unable to purchase goods on credit, another which was sufficiently credit worthy would do so, and then sell the purchased goods on credit to its affiliated corporation. It appears that at least some such "loans" or credit sales between the various corporations were entered on the books of each and in the proper accounts.

Thus, it is alleged that although the debtors maintained separate title to most assets, separate payrolls, filed separate tax returns and financial statements, and for the most part observed corporate formalities, there is sufficient evidence of the integration of business operations, numerous examples of shared personnel and equipment, and such frequent inter-corporate borrowing and guarantees as to warrant a finding that the six corporate debtors should be treated as one. In opposition, the Commerce Bank argues that although there were minor deviations from corporate formality, the six debtors, for the most part, maintained their corporate integrity. As such, and in view of the certain prejudice to the bank's secured position it argues that consolidation should not be permitted.

234

**234**

■ The power to consolidate the estates of separate debtors is one arising out of equity, enabling the bankruptcy court to disregard corporate entities in order to reach assets for the satisfaction of a related corporation. *In re Continental Vending Machine Corporation*, 517 F.2d 997, 1000 (2nd Cir. 1975). It is a power which should be used sparingly, for while the term has a disarmingly innocent sound, consolidation in bankruptcy is no mere instrument of procedural convenience, but a measure vitally affecting substantive rights. *Matter of Flora Mir Candy Corporation*, 432 F.2d 1060, 1062 (2nd Cir. 1970); *Chemical Bank New York Trust Company v. Kheel*, 369 F.2d 845, 847 (2nd Cir. 1966).

It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors. See *In re Coventry Energy Corporation*, 5 B.C.D. 98 (S.D.Ohio 1979). This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower. Why then would substantive consolidation ever be permitted?

A review of the case law reveals that equity has provided the remedy of consolidation in those instances where it has been shown that the possibility of economic prejudice which would result from continued corporate separateness outweighed the minimal prejudice that consolidation would cause. While several courts have recently attempted to delineate what might be called "the elements of consolidation", *In re Food Fair, Inc.*, 10 B.R. 123, 124 (Bkrtcy.S. D.N.Y.1981); *In re Vecco Construction Industries, Inc.*, 4 B.R. 407, 6 B.C.D. 461, 1 C.B.C.2d 216 (Bkrtcy.E.D.Va.1980), I find that the only real criterion is that which I have referred to, namely the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation. There is no one set of elements which, if established, will mandate consolidation in every instance. Moreover, the fact that

corporate formalities may have been ignored, or that different debtors are associated in business in some way, does not by itself lead inevitably to the conclusion that it would be equitable to merge otherwise separate estates.

A review of the cases which have considered the question is enlightening. The first case in the most recent line of cases dealing with the question of consolidation was *Soviero v. Franklin National Bank of Long Island*, 328 F.2d 446 (2nd Cir. 1964). There the evidence established that one bankrupt corporation had received all sale proceeds generated by its affiliates, maintained all inventories and only arbitrarily assigned inventory to its affiliates at year end, received all bills and paid all suppliers for all of the corporate debtors, and paid all labor charges, advertising charges, union dues, insurance and accounting expenses for each corporation, and then arbitrarily charged each affiliate at year end. Finally, the companies used a consolidated financial statement and all guarantees given to customers of the affiliates were given in the bankrupt's name. On those facts, the circuit court affirmed the trial court's decision to ignore the corporate entities and treat them as one. The trial court had cited the "unity of interest and ownership common to all corporations" as one of the reasons for permitting the trustee in bankruptcy to look to the assets of the non-debtor affiliates for satisfaction of the claims of the bankrupt's creditors. The essential holding of the appellate court, however, was stated thusly,

On these facts, we are all convinced that the claims of individual corporate entities [sic] advanced for the Affiliates and Realty [bankrupt] are "without color of merit, and a mere pretense". *Soviero*, supra at 448, citing *Harrison v. Chamberlin*, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926)

It was on that basis that the circuit court dismissed the objecting creditor's adverse claim as unreasonable. Furthermore, it confirmed the referee's conclusion that to adhere to the separate corporate entities

theory would result in an injustice to the bankrupts' creditors.

Thus, it was not simply the commingling of assets and flagrant disregard of corporate forms which led to consolidation, but the injustice to creditors which would result if consolidation were not permitted. The decision did not state that in all cases of such asset commingling and corporate infidelity that consolidation was warranted. Rather, it was the resultant injustice to creditors of the bankrupt which continued separateness would have caused which led the court to look to the assets of the affiliates for payment of the bankrupt's debts. Furthermore, the circuit court indicated that it would permit consolidation in such cases where the asserted claim of corporate separateness was sufficiently unrealistic as to be a mere pretext. Thus, it would appear that the circuit court held that where consolidation was otherwise warranted, creditors who knew or should have known of the close association between affiliate and bankrupt may be estopped to assert prejudice caused by legal recognition, in the form of consolidation, of an otherwise homogenous corporate framework. See *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942), rehearing den. 128 F.2d 16, cert. denied 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942).

This concept was expanded upon by the second circuit in *Chemical Bank New York Trust Co. v. Kheel*, supra (hereinafter, *"Chemical Bank"*). In that case, decided two years after *Soviero*, there were seven corporate debtors involved in the shipping industry. Each filed a Chapter X petition under the Bankruptcy Act, and each was subsequently converted to liquidation proceedings. All the corporations were owned or controlled by one man, all were operated as a single unit with common directors and stockholders, and all had ignored corporate formalities. The court cited examples of inter-corporate commingling of funds, inter-corporate loans, inter-corporate borrowings and asset use, none of which was sufficiently recorded on the books of the various

debtors. The district court found that on these facts "the auditing of the corporations' financial condition and especially the intercompany relationships would entail great expenditure of time and expense without assurance that a fair reflection of the conditions of the debtor corporations would in the end be possible". *Chemical Bank*, supra at 846.

A mortgagee objected to consolidation on the basis that if its mortgage, which was the subject of challenge, were declared invalid its then-unsecured dividend would be reduced by consolidation. The court specifically noted, however, that if the lien were found to be valid, its claim would be paid in full.

In affirming the lower court's decision to consolidate, the appellate court held that "where the interrelationships of the group [of debtors] are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors",[3] consolidation "was justified and indeed required".[4] Furthermore, they indicated that the critical factor in that case was "the expense and difficulty amounting to a practical impossibility of reconstructing the financial records of the debtors to determine inter-corporate claims, liabilities and ownership of assets". *Chemical Bank*, supra at 847. Finally, implicit in the court's decision was the conclusion that the practical necessity of consolidation to protect the possible realization of any recovery for unsecured creditors far outweighed the prospective, and contingent, harm that might result to the objector.

*Soviero* and *Chemical Bank* were the progenitors of numerous later decisions in this area, and an understanding of those two cases is critical to any analysis of circumstances which might lead to consolidation of estates. For instance, in *Chemical Bank* the court noted that *Soviero* does not require the proponent of consolidation to prove that the objector dealt with the "consolidated debtors" as one, but rather it indi-

---

**3.** *Chemical Bank*, supra at 847.

**4.** *Id.*

cated in *Chemical Bank* that whether a creditor or creditors looked solely to the assets of one corporation for its satisfaction was a matter of defense by the objecting creditor. Indeed, Judge Friendly in his concurring opinion in *Chemical Bank* stated,

I cannot agree that a practice of handling the business of a group of corporations as to impede or even prevent completely accurate ascertainment of their respective assets and liabilities in their subsequent bankruptcy justifies failure to make every reasonable endeavor to reach the best possible approximation in order to do justice to a creditor who had relied on the credit of one—especially to a creditor who was ignorant of the loose manner in which corporate affairs were being conducted. *Chemical Bank*, supra, concurring opinion of Judge Friendly, at 848.

Moreover, Judge Friendly recognized that even where a creditor could affirmatively established that it relied solely on the credit of one corporation, "such considerations would have to yield to practicalities if even an approach to a proper accounting within the corporate group was impossible or prohibitively expensive". *Id.* While he did not feel that the situation in the *Chemical Bank* case was that aggravated, he nevertheless concurred in the result by reason of the objecting party's failure to establish that it relied on the separate credit of its mortgagor.

Thus, *Soviero* and *Chemical Bank* established the guidelines for later discussion of consolidation. It should be noted, however, that in both cases, the proponent of consolidation did not rely solely on the fact of a lack of corporate separateness as grounds for consolidation, but additionally established a *substantial* prejudice as a result thereof. Moreover, in both cases, the circuit court held that no major injustice would occur to any class of creditors as a result of consolidation. Finally, both cases indicated that, in certain instances, affirmative proof that a creditor or class of creditors had looked solely to the credit of one corporation would be a defense to consolidation. This last concept was solidified by the second circuit's decision in *Matter of Flora*

*Mir Candy Corporation*, 432 F.2d 1060 (2nd Cir. 1970).

In *Flora Mir*, one parent corporation and twelve affiliates or subsidiaries filed for individual Chapter XI relief. The court found a multitude of intercompany transactions which would have made difficult the task of disentangling the affairs of each debtor. However, one affiliate had ceased doing business "prior to the intercorporate deluge", and its assets and transactions were found to be capable of easy identification and segregation. Judge Friendly, writing for the circuit court, held that where it was a near certainty that consolidation of that debtor with the others would cause unfair treatment of its debenture-holders, consolidation would be inequitable even though *most* general creditors had treated the debtors as one. The court openly doubted whether any showing of accounting difficulties, such as those in *Chemical Bank*, would warrant consolidation where the pertinent debtor had ceased operating long before the parent and its affiliates had begun their inter-corporate dealings. In *Flora Mir*, the court cited *Chemical Bank* for the proposition that

[e]ven though the interrelationship [between corporate debtors] existed at the time credit was extended, the power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who may have dealt with that debtor without knowledge of its interrelationship with others. *In re Flora Mir Candy Corp.*, supra at 1062–63.

In *Flora Mir*, the circuit court affirmed a judgment of the district court reversing a referee's order of consolidation as to one of thirteen corporate debtors. Even though the requisite elements of interrelationship existed as to the other twelve debtors, the one debtor had existed separately prior thereto and had since ceased operations. Because its assets and liabilities could most likely be ascertained with reasonable certainty, the court felt it was equitable to isolate that debtor from the rest. *Flora Mir* is a good example of a situation where the

harm to objecting creditors outweighed the concerns of creditors of the remaining debtors for whose benefit consolidation was sought. Moreover, in comparing this case to that of *Chemical Bank*, it was said:

But here there was no evidence as in the *Chemical Bank* case cited, that the interrelationships of the group are hopelessly obscured . . . . To the contrary, the accountants in relatively short order had managed to come up with financial statements of each of the debtors. [footnote omitted]. Whatever problems there might be with respect to intercompany accounts among other debtors, those with respect to Meadows were few. . . . *In re Flora Mir Candy Corp.*, supra at 1063.

Thus, we have two cases where the interrelationships between corporate debtors were found to be such that prejudice would result if the estates were not merged, and one case holding that consolidation was not warranted where a class of creditors of one debtor could be said to have looked solely to the credit of that debtor and that merger of their debtor's assets with those of its affiliates would be harmful to them.

█ The last decision in the line of second circuit decisions on this issue was *In re Continental Vending Machine Corporation*, 517 F.2d 997 (2nd Cir. 1975). There the appeals court, in affirming the district court, held that it was not inequitable to allow consolidation for purposes of unsecured claims while at the same time denying the benefits of consolidation to secured creditors. Reasoning that the intercompany transfers which had prejudiced the claims of many unsecured creditors had not involved or diminished the value of lien property, the court held that consolidation of secured claims was unnecessary because that class had not been harmed. Thus, it can be seen clearly that consolidation is not a matter of simply showing corporate interrelationship, but harm thereby as well. Moreover, that harm which is shown must rise above the potential or real harm to those who might object to consolidation. Finally, as we saw in *Soviero*, a creditor may be estopped from asserting reliance on corporate separateness where such a claim would be unreasonable in light of all the facts.

No better example of this last statement can be found than in *Matter of Commercial Envelope Manufacturing Company, Inc.*, 5 B.C.D. 647 (S.D.N.Y.1977). There, four related corporations filed separate Chapter XI petitions. There were common shareholders and directors for each debtor. Due to inadequate bookkeeping and the failure to keep separate records, isolating and ascertaining the individual assets and liabilities of each debtor would have been difficult and costly, with a substantial likelihood that no audit would ever be successful. There were numerous cross-guarantees by and between the debtors, including one by the parent corporation for the debt of its subsidiary to an objecting creditor. Finally, the evidence showed that the four companies were operating profitably on a "consolidated basis", and therefore, it was concluded that formal consolidation would probably increase continued profitability, which would enure to the benefit of all creditors.

On these facts the bankruptcy judge held that where the interrelationship of the group of debtors was hopelessly obscured, and where it was shown that consolidation would improve the financial condition of all debtors, the possibility of harm to the objecting creditor was far outweighed by the exigencies of consolidation and by the likelihood of benefit to all creditors, including the objector. Moreover, the court gave little weight to the objector's claim of prejudice because, by reason of its receipt of a corporate guarantee, the objector had reason to know of, and could be deemed to have relied on, the inter-corporate relationship of these debtors.

█ While the bankruptcy court in *Commercial Envelope* relied on the existence of the "common ingredients that seem to be present in all instances where consolidation was permitted", *Commercial Envelope*, supra at 649, the actual basis for its decision to consolidate was shown to be the benefit that would result to all creditors, including the objecting creditor. Moreover, it did not

state that the objector's knowledge of inter-company relations was a factor in deciding that consolidation was warranted, but rather, used that fact to mute the objector's adverse claim to the merger of estates. Therefore, it is fair to conclude that there are two distinct standards of proof in any consolidation issue. First, the applicant must show that there is a necessity for consolidation, or a harm to be avoided by use of the equitable remedy of consolidation. As Judge Babbit noted in *Commercial Envelope*:

> The evidence in support should satisfy the court and should be more than a pro forma exercise. This is particularly so here where as a creditor claims he would be prejudiced by the favorable exercise of this court's power to achieve what the debtor seeks. *Matter of Commercial Envelope*, supra at 648.

Moreover, the evidence in support of an application to consolidate must do more than show a unity of interest or an intermingling of funds. It must show a harm which has resulted therefrom, *Soviero v. Franklin National Bank of Long Island*, supra, or that prejudice will result from a lack of consolidation. *Chemical Bank New York Trust Co. v. Kheel*, supra. Indeed, consolidation has been denied even though the debtors had always conducted their business on a consolidated basis, with a joint bank account, inter-corporate loans, and joint payroll, because the court was not satisfied that the prior practice of operating as a single unit was necessary or desirable. *In re Coventry Energy Corporation*, 5 B.C.D. 98 (S.D.Ohio 1979). In addition, consolidation was denied in that case despite the absence of objections by any party. Hence, it must be clearly shown that not only are the "elements of consolidation" present in a given bankruptcy setting, but that the court's action is necessary to prevent harm or prejudice, or to effect a benefit generally. The "elements of consolida-

tion" cited by recent cases such as *In re Vecco Construction Industries, Inc.*, 4 B.R. 407 (Bkrtcy.E.D.Va.1980) and *In re Food Fair, Inc.*, 10 B.R. 123 (Bkrtcy.S.D.N.Y. 1981) were but one factor in the overall proof of the necessity or desirability for consolidation.

■ Finally, once the applicant has established by affirmative proof the need for consolidation, there is still the matter of the defense that the benefits of consolidation do not outweigh the harm to be caused to the objector. A creditor who has looked solely to the credit of its debtor and who is certain to suffer more than minimal harm as a result of consolidation may be entitled to denial of a request for consolidation. *Matter of Flora Mir Candy Corporation*, supra. However, such a defense has been denied to creditors who could be deemed to have dealt with the debtors with full knowledge of their "consolidated operation" and who therefore could be estopped to assert corporate separateness.[5] *Chemical Bank*, supra.

■ This lengthy discussion of the law in this area was necessitated by the nature of the facts before me in this case. As was said earlier, consolidation should not be granted hastily or arbitrarily, and the question should be decided only after a careful review of all the relevant circumstances. Finally, the review of the cases has shown that the burden of proof for those seeking consolidation is substantial and is independent of any defenses or adverse claims by those who might object to consolidation.

■ After a careful review of all the facts before me at this time, I cannot say that consolidation is warranted in the instant cases. Let me hasten to point out that this conclusion is *not* based upon the possible harm which might result to the secured position of the Commerce Bank, but rather follows from the applicants' failure to show that consolidation is necessary or desirable.

---

5. While some courts have cited the existence of inter-corporate guarantees as an element of consolidation, it should be noted as well that the taking of a corporate guarantee by a creditor may be used to show that said creditor knew of the consolidated nature of the debtors' business. *Commercial Envelope*, supra. Thus, that fact would bear not upon proof of the need for consolidation, but on the availability of a defense thereto.

The facts before me lead inevitably to the conclusion that the six debtors' operations were not so hopelessly obscured as to render meaningless an accounting of their assets. It is evident that despite the frequency of inter-corporate transactions, loans, direct sales and guarantees, each debtor did keep separate records of the same. Moreover, the creditors committees have only generally alleged that they will be harmed by continued separation of each estate. I cannot say that it is sufficient for a decision in favor of consolidation to simply allege that considerable time and expense will be necessary to *verify* accounting entries which otherwise appear to accurately reflect the assets and liabilities of each debtor. The lack of any reference to any specific sizeable transaction which is unaccounted for is noticeable by its absence. Further, both sides agree that the debtors, for the most part, made every effort to segregate all assets and liabilities. While certain personnel from time to time may have crossed over corporate lines in their work, without proper reimbursement from the debtor who benefitted, this fact alone should not give rise to the extreme remedy of consolidation. Further, it has not been shown that the use of one bookkeeping staff for all six debtors in any way operated to prejudice creditors generally. In fact, it probably was of general benefit by reducing each debtor's relative overhead expense. Finally, if the aforementioned transgressions against corporate integrity had been supplemented by other more substantial examples, the court might be more easily persuaded that consolidation was necessary. But, that is not the case here, for it appears that although there was an integrated business operation, there is no evidence to suggest that these debtors had so entangled their financial structures as to make separation of them impossible.

The fact that minor deviations from corporate separateness may have been permitted by each debtor probably has no meaning in view of the burden on those requesting consolidation to show that they were substantially harmed by the corporate infidelity. The applicants here have failed to allege any substantial harm or injustice to them which occurred as a result of the way in which these debtors did business.

Moreover, it is entirely possible that had these debtors been a functioning business operation at the time of the request for consolidation the court might have been willing to examine the possible benefit to creditors that consolidation would bring. Indeed, it could be said that consolidation is more favorable in a Chapter 11 reorganization where there is an on-going business operation which is likely to be more profitable as a result of consolidation. But where, as here, the debtors had ceased doing business, and where the possibility of a consolidated sale of all of the debtors' assets is remote, the Court finds it difficult to see any possible benefit that may arise as a result of consolidation. Thus, there remains only the question of harm if consolidation is not granted and, as I have already discussed, no such harm has been shown.

Finally, I am not persuaded that consolidation is warranted for the sole reason that no objection was made by any unsecured creditors. The decisions I have cited have implicitly recognized the fact that large numbers of creditors may be substantively affected by consolidation, but will not otherwise appear and object because the value of their individual claims against the estate may not justify the additional legal expense. Every case cited made note of the bankruptcy court's obligation to make independent inquiry into the necessity and desirability of substantive consolidation. It is my finding and conclusion today that, notwithstanding the objection by the Commerce Bank, the parties seeking consolidation have failed to show sufficient cause therefore, and accordingly, that their request should be, and hereby is, DENIED. So ordered.